On Behearing.
InsnEV, J.
This case is before us on a rehearing. The rehearing was granted upon the plaintiff’s argument, that according to the weight of evidence, after the marriage of George Balston to Eliza J. Sanderson in 1852, they acquired a domicil in Louisiana.
There is in the record unquestioned testimony, that after the marriage Balston and wife were established on the plantation called “Waverly,” in the parish of Concordia, and this seems to have been their only home for a year or more after such establishment.
The establishment of a newly married couple carries with it the idea of fixity and permanence.
Upon a re-examination of the evidence, which we have attentively reconsidered, we incline to the opinion that the actual continuance of Balston and wife, for a year or more, at a home in which they were thus established, was sufficient to fix their domicil in Concordia parish under the law of Louisiana.
It is true, Dr. Sanderson, Mrs. Balston’s father, did not then convey a title to Balston and wife, or either of them, in the Waverly plantation, but from the fact that it was treated as their plantation; that Balston, until Dr. Sanderson’s death, had no other occupation but that of administering this plantation, and that, shortly after his death, the heirs in an *320 amicable partition of his large succession, assigned this plantation to Mrs. Ralston as a part of her inheritance; it is .not unreasonable to conclude that it was always the intention of Dr. Sanderson, and understood among the family, to set apart this property for her.
George Ralston, having in this manner acquired a domicil in Louisiana after his marriage, could not lose it without acquiring a new one. To accomplish such a change, it should appear that he removed in fact to another State or country, at the same time intending to give up his domicil in Louisiana, and get a new one elsewhere.
Mrs. Ralston, having resided with him a year or more on the Waverly plantation, and finding her health impaired by living there, went to a house purchased by her father, in his own name, upon the elevated land in the neighborhood of Natchez and a few miles from Waverly, to take up her abode.
Her removal to that house to improve her health, did not change her husband’s domicil. Our law considers the domicil of the husband as controlling that of his wife, although she may actually inhabit another country. The evidence shows that no children were born of this marriage, and that Mrs. Ralston was actuated by a desire to regain and preserve her health in going from the low lands of Concordia parish to dwell on the other side of the Mississippi river, upon the hills.
The fact of a removal, with a view to a change of residence by Mr. Ralston himself, is not satisfactorily established, though after his wife’s removal he was often at the house near Natchez, occupied by her. But there is positive testimony, that after as well before her removal, he spent the greater part of his time in Louisiana, attending to his interests at Waverly. It should have been shown that in spending the rest of his time at the house near Natchez, he did so with the intent to change the domicil acquired in Louisiana.
But the evidence leads to the conclusion that he. did not intend to give up that domicil, and to adopt a Mississippi domicil.
Without such an intent on his part, accompanying an actual removal, he cannot be considered as having changed his domicil. We find repeated allusions to his service on juries in the parish of Concordia. He served ion a grand jury in that parish in 1860. He voted there not only since the late war but before.
These are important public and notorious acts of citizenship, implying a Louisiana residence, and they occurred ante litem motam at an unsuspicious time.
On the other hand, there is no evidence of his having exercised any such rights in the State of Mississippi at any time.
It appears that he was on one occasion called upon to do jury duty in Adams county, Miss., but that the Court excused him on the ground of his non-residence. Adams county is opposite Concordia parish, and we think miich weight should be attached to these circumstances, occurring on both sides of the river, as showing in what light his domicil was regarded by those who had the best means of knowledge respecting it.
His appointment as a police juror for Concordia by the governor of Louisiana in 1865, his voting in Concordia in 1866, and his declaration in an act of sale of November 2d, 1865, alluded to in our former opinion, *321 would not be conclusive if they stood alone, but they may be viewed in connection with the antecedent facts just referred to, as corroborative evidence to show that Ralston never intended to abandon his domicil in Louisiana.
In the absence of any countervailing iacts oi equal weight, showing an intent on his part to acquire a Mississippi domicil, those which we have, considered already, would suffice to sustain the judgment of the lower court.
The contradictory circumstances referred to in the first opinion of the Court, as of the greatest consequence, were the descriptive declarations in the acts of partition of the 7th and 8th February, 1856, between the Sanderson heirs, and the act of purchase of a Tensas plantation on the 5th March, 1857, in which Ralston is spoken of as a resident of Mis-. sissippi.
Were these acts written by Ralston himself, or were the location of his domicil at all material to the subject-matter of the acts, these declarations would assume a graver importance. But they were not written by him,. and it was not material that his residence should be stated with accuracy or even stated at all. Indeed, in two of the acts, there were a number of parties who resided in Adams county, Miss., and Ralston was included in one common description with them. The force and effect of such descriptive recitations, in determining the domicil of parties, has been heretofore discussed in this court, and they have been held as of secondary importance in the cases of Hill v. Spangenberg, 4 A. 553, and New Orleans v. Sheppard, 10 A. 268.
In the former ease, the Court said: “ The descriptive words used in the notarial acts were admissible in evidence against the defendant, and a fair subject of consideration in connection with other facts, in testing the question of evidence. But we do not consider such immaterial recitals in contracts with third persons as conclusive upon the party making them, in a contest with others upon a question of jurisdiction. As to the comparative weight of this evidence, it may be considered as inferior to another implied declaration of the defendant, on the subject of this domicil. The recital in the notarial act was immaterial, and may have been in reality the act of the notary, and not suggested by the defendant, nor noticed by him; but his voting in the parish of Jefferson was his own deliberate act, clearly implying a declaration that he resided in that parish, and involving a fraud upon the public, if that declaration was untrue.
In the ease of New Orleans v. Sheppard, it was observed: “ There are in evidence but four documents of date posterior to 1847, which contain the recitals “of New Orleans,” and “residing in New Orleans,” to which the District Judge has attributed so much significance.” It is true that such descriptive words used in notarial acts and judicial proceedings are admissible in evidence against the defendant, and are fair subjects of consideration in connection with other facts touching the question of domicil. But it must be observed of these recitals, that upon none of the cases in which they were used were they essential averments; they were hot material, either as regards the contract in which this occurred, *322 or the jurisdiction of the court to which they were addressed; they were inserted in one case by a notary, in the other by an attorney-at-law, and being immaterial to the matters in hand, may not have received the deliberate attention of Sheppard. They are overshadowed in the present case by other facts: continuous acts done by Sheppard, and declarations immediately and deliberately emanating from him at a time not suspicious.”
The case of the Commercial Bank of Natchez v. King, 3 Rob. 243, like other cases cited for the intervenors, does not seem specially applicable to the present case. The party there had by repeated and public declarations upon the subject, and holding himself out to all persons as a resident of the parish of Madison, induced a notice of protest to be sent to him there, and he was held bound by it, though in fact he resided in Mississippi.
These questions of domicil are usually questions cf great nicety, and. in a country like this, of constant changes, and frequently of divided or double residences, they are particularly difficult. In'such cases it is impossible to harmonize all the evidence.
A preponderance of evidence, tending to a probability of truth, must turn the scale.
If the testimony in this case were equally balanced, instead of leaning as we, upon more deliberate consideration, think it does in favor of the plaintiff’s position, we should defer, more than in ordinary cases, to the opinion of the local Judge, whose knowledge of parties and witnesses is presumed to be better than ours.
He decided in favor of the plaintiff and against the intervenors.
For the foregoing reasons, it is ordered that the judgment heretofore rendered in this case be set aside, and the judgment of the District Court affirmed, with costs.